LONG LAKE ENERGY
CORPORATION,
Plaintiff,

v.

NIAGARA MOHAWK POWER
CORPORATION, Defendant.

No. 87 Civ. 9084 (WK).

United States District Court,
S.D. New York.

Nov. 23, 1988.

Robert L. Sills, Reboul, MacMurray, Hewitt, Maynard & Kristol, New York City; Robert J. Riegel, James B. Blaney, Janet E. Mattick, on the brief, for plaintiff.

Grant S. Lewis, Leboeuf, Lamb, Leiby & MacRae, New York City (Thomas G. Rohback, Dennis P. Harkawik, of counsel), Gary J. Lavine, Michael W. Murphy, Niagara Mohawk Power Corp., Syracuse, for defendant.

## MEMORANDUM AND ORDER

WHITMAN KNAPP, District Judge.

Defendant Niagara Mohawk Power Corporation ("Niagara") brings this motion for summary judgment on the ground that plaintiff Long Lake Energy Corporation ("Long Lake") cannot, as a matter of law, establish an "antitrust injury". In the alternative, Niagara seeks a stay pending the resolution of prior-filed agency proceedings. For reasons which follow, we deny the motion for summary judgment without prejudice to renewal at the close of discovery, deny the motion for a stay and refer the case to a magistrate for the supervision of discovery.

## BACKGROUND

The Public Utility Regulatory Policies Act ("PURPA"), 16 U.S.C. §§ 2601 *et seq.*, was enacted in 1978 to promote the development of alternative energy sources. Under PURPA, electric utilities such as Niagara are required to purchase electricity generated at hydroelectric sites in its franchised area by alternative energy producers such as Long Lake at its "avoided cost", which is the cost the utility would have incurred in producing the energy itself. If the alternative energy producer chooses to sell the power outside the utility's territory, the utility is required to "wheel" the power over its transmission facilities to the purchasing utility. If cer-

tain regulatory requirements are met, the alternative energy producer may also sell the power to customers within the utility's franchised area.

Doubtless because, irrespective of the avoided cost price established under PURPA, New York's Public Service Law requires Niagara to pay a minimum price in excess of $.06/kilowatt hour, a price well above the market, Long Lake currently sells the power it produces exclusively to Niagara. *See* N.Y.Pub.Serv.L. § 66c(1) (McKinney 1988 Supp.). This arrangement may well change, however, as the Public Service Commission ("PSC") and the Federal Energy Regulatory Commission ("FERC") implement and expand on their recent rulings that utilities and independent power producers are in the future to competitively bid against each other for contracts to supply energy. *See Bidding, Avoided–Cost Pricing and Wheeling Issues*, Case No. 29409, Opinion No. 88–15 (N.Y.P.S.C. June 3, 1988); *Regulations Governing Bidding Programs (Notice of Proposed Rulemaking*, 53 F.R. 9324, IV F.E.R.C.Rep. (CCH) ¶ 32,455 at 32,036 (March 22, 1988).

We, of course, are required to view the facts in the light most favorable to Long Lake, the non-moving party. This action, which has been brought under the Sherman Antitrust Act, 15 U.S.C. §§ 1 *et seq.*, with pendent claims under the Donnelly Act, New York General Business Law § 340, is only one battle in a much larger war between Long Lake and Niagara. The two have been at odds repeatedly before the FERC, the PSC, the New York State Department of Environmental Conservation, and in the New York state courts. In fact, several of Long Lake's complaints stem from this litigation war.

In its very detailed amended complaint, Long Lake alleges, in summary, that Niagara has:

(a) Improperly employed and sought to employ legal and administrative processes to obtain or perpetuate its monopoly, and to thwart competition for hydroelectric licenses at many sites within its territory;

(b) Proposed to divide markets and end competition with Long Lake, a *per se* violation of the antitrust laws;

(c) Unlawfully threatened that, unless Long Lake agreed to Niagara Mohawk's plan to divide markets and end competition with Long Lake, it would seek to prevent Long Lake from obtaining any licenses in its territory, and otherwise to harm Long Lake's business;

(d) Improperly interfered with Long Lake's ability to compete for licenses to develop hydroelectric sites by denying Long Lake access to its property at such sites, or refusing to provide necessary information concerning those sites, and refusing to cooperate in any way with Long Lake;

(e) Unreasonably and arbitrarily delayed the sale and transfer of certain of its properties to Long Lake;

(f) Filed frivolous license applications and other pleadings with the FERC, not with the expectation of obtaining the relief sought therein, but to interfere with Long Lake's business, and improperly employed and sought to employ legal and administrative processes by, among other things, commencing or prosecuting legal and administrative proceedings with a view toward increasing the expense and delay faced by competitors such as Long Lake, and by instigating or supporting other parties, including environmental groups, to oppose Long Lake's projects;

(g) Refused in bad faith to negotiate and enter into power sales contracts with Long Lake, whereas Niagara Mohawk has entered into favorable and discriminatory contracts and arrangements with independent power producers which do not compete with it, and which, on information and belief, have unlawfully agreed not to compete with Niagara Mohawk; and

(h) Refused to negotiate in good faith with Long Lake to resolve disputes necessary to allow Long Lake to conduct its business.

Amended Complaint at 13–14. The complaint further alleges that these actions

illegally hindered Long Lake's efforts to develop plants in Niagara's territory and deprived energy consumers of the benefits of competition. Although it is not here relevant, we note that Niagara denies each of these allegations.

## DISCUSSION

■ Niagara argues that, even if it did engage in the actions alleged, it did not cause plaintiff an injury remediable under the antitrust laws. According to Niagara, since Long Lake has a guaranteed market at an above-market minimum price for all the power it can produce, it does not operate in the sort of competitive market that the antitrust laws govern, and thus it cannot, as a matter of law, prove an injury to competition. Long Lake, of course, disagrees, asserting that it competes with one of the vertically integrated parts of Niagara, the part that, like Long Lake, generates power. In other words, in Long Lake's view, Long Lake and the power-generating part of Niagara compete to be able to supply power to the power-distributing part of Niagara. According to Long Lake, this is just the sort of competition the antitrust laws were designed to preserve.

The Second Circuit has not yet ruled on a case of this nature. Niagara urges that the Supreme Court's holding in *Brunswick Corp. v. Pueblo Bowl–O–Mat* (1977) 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 precludes plaintiff from maintaining suit under the antitrust laws. That case requires that plaintiffs establish "more than an injury causally linked to an illegal presence in the market. Plaintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Id.* at 489, 97 S.Ct. at 697 (emphasis in the original). In *Brunswick Corp. v. Riegel Textile Corp.* (7th Cir.1984) 752 F.2d 261 (Posner, J.), the Seventh Circuit interpreted this requirement as barring an antitrust suit by a textile manufacturer that claimed that another textile manufacturer had monopolized the market for antistatic yarn by fraudulently obtaining a patent. Although Niagara vigorously denies that it competes

with Long Lake, it urges that, just as in the case of rival applicants for a patent in *Riegel Textile Corp.,* the disputes between Long Lake and Niagara involve the mere substitution of one supplier for another and are thus a matter of indifference to consumers and to the antitrust laws. *See also Fishman v. Estate of Wirtz,* 807 F.2d 520 (7th Cir.1986) (Easterbrook, J., dissenting).

*Riegel Textile Corp.* and the other cases cited by Niagara appear to be distinguishable on the facts. In any event, we are not prepared to determine as a matter of law from the undeveloped record before us whether or not Niagara's alleged wrongdoing "cannot cause antitrust injury to anyone, because it has no tendency to raise prices or reduce output or do anything else that hurts consumer or other interests protected by the antitrust laws...." 752 F.2d at 268. We are also not equipped by the record before us to come to what we currently view as the counterintuitive conclusion that Niagara and Long Lake are not, as a matter of law, in competition with one another. The questions here presented will ultimately have to be resolved by the Second Circuit. It should be able to do so on a full record. As the Supreme Court noted, dismissals in antitrust cases "prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *Hospital Building Co. v. Trustees of Rex Hospital* (1976) 425 U.S. 738, 746, 96 S.Ct. 1848, 1853, 48 L.Ed.2d 338. We therefore deny defendant's motion for summary judgment without prejudice to renewal at the close of discovery.

■ We also deny defendant's motion for a stay pending the outcome of prior-filed agency proceedings. Contrary to Niagara's contentions, there is here no basis for applying the doctrine of primary jurisdiction. Under that doctrine, a court may defer to an agency where a case "requires resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body." *United States v. Western Pacific R. Co.* (1956) 352 U.S. 59, 64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126. Although, as plaintiff points out in its complaint, there are a host

of agency proceedings now underway before the FERC and the PSC, these agencies do not have the power to grant the relief sought in this action, treble damages for alleged violations of the antitrust laws and a broad injunction against further anticompetitive acts.

Congress, in enacting PURPA, clearly did not intend to have agency proceedings forestall antitrust actions. The Congressional conference report stated:

> The conferees intend to preserve the jurisdiction of the Federal and State courts in actions under the antitrust laws, whether or not the parties to such actions could have sought remedies under this legislation.

> Specifically with regard to certain authorities to order interconnections and wheeling under Title II, it is not intended that the courts defer actions arising under the antitrust laws pending a resolution of such matters by the Federal Energy Regulatory Commission. The conferees specifically intend to preserve jurisdiction of Federal and State courts to resolve, independent of the Commission, such actions, including for example, cases where a refusal to wheel electric energy is alleged to be in violation of such laws. The court should be able to act whether or not action by the Commission under the provisions in Title II can be requested or would be justified. *In this way, the courts have jurisdiction to proceed with antitrust cases without deferring to the Commission for the exercise of primary jurisdiction.*

1978 U.S.Code Cong. & Admin.News 7802 (emphasis added). In light of this positive expression of Congressional intent and our determination that the doctrine of primary jurisdiction is inapplicable, we decline to grant a stay.

It may well be, however, that, without substantially delaying the progress of this lawsuit, pre-trial proceedings might be so scheduled as to avoid unnecessary conflict with the various administrative bodies already involved in this controversy. Also it might be that it would promote judicial economy to arrange things so that an ad-

ministrative agency could proceed with the determination of factual disputes in which it is already engaged, without interference from extensive discovery in those areas. The matter is therefore referred to Magistrate Naomi Buchwald to supervise discovery with these considerations in mind. The Magistrate should, however, never lose sight of the fact that this court's primary duty lies in the expeditious progress of this lawsuit.

### CONCLUSION

In summary, we deny defendant's motion for summary judgment without prejudice to renewal at the close of discovery. We deny defendant's motion for a stay. We refer the case to Magistrate Buchwald to supervise discovery.

SO ORDERED.